### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: | ) |
| | ) Chapter 13 |
| ERIC CARL ZIERKE | ) |
| | ) Bankruptcy No. 14-00586 |
| Debtor. | ) |

### MEMORANDUM AND ORDER RE:
### OBJECTION TO PROOF OF CLAIM #8

Eric Carl Zierke ("Debtor") objected to Security State Bank, Hubbard's ("Bank") Proof of Claim. Debtor objects on the grounds that he did not sign the disputed notes or otherwise agree to acquire the debt. He claims that his ex-wife fraudulently signed his name and obtained these loans. The Bank argues that these loans were not obtained fraudulently and that Debtor in fact signed and/or agreed to incur the debt. Therefore, the Bank asserts its proof of claim is valid. The Court held an evidentiary hearing on November 18, 2014. Jonathan A. Coy and Patrick C. Peters appeared for Debtor. H. Raymond Terpstra appeared for the Bank. This is a core proceeding under 28 U.S.C. 157(b)(2)(B).

### STATEMENT OF THE CASE

Debtor argues that he cannot be liable for the debts that Bank asserts because these debts were fraudulently obtained by his former wife, Stephanie Drake-Zierke. Specifically, Debtor argues that Stephanie forged his signature on the disputed bank notes. Debtor asserts that he should not be held responsible for

these fraudulent debts in his bankruptcy. The Bank argues that the notes are valid and were not fraudulently obtained. The Bank argues its claims should be addressed in Debtor's bankruptcy because Debtor is a co-maker on each loan. The Court overrules Debtor's objection to the Bank's Proof of Claim.

## FINDINGS OF FACT

The Bank filed a timely proof of claim for two notes. Debtor objected to the proof of claim. The debts in dispute are for Note 10362510 ("First Note") and Note 10367540 ("Second Note"). The First Note is for $205,166.14, and the Second Note is $235,925.80 (collectively, the "Notes").

The date listed for the First Note is March 9, 2009. The First Note was allegedly signed by Debtor, Stephanie Drake-Zierke ("Stephanie"), and Debtor's parents. The date listed for the Second Note is April 09, 2010. The Second Note was allegedly signed by Stephanie and Debtor.

Debtor states that he did not sign either Note. He contends that Stephanie forged his signature.[1] The Notes were secured by real estate that Debtor and Stephanie jointly owned. The real estate used as security included Debtor's shop (the "Bunker Property") and a rental property. It did not include Debtor's home. The Notes were consolidations of preexisting debt, including debts related to the

---

[1] Debtor also disputes other proofs of claim, including a claim from HSBC Mortgages Services, Inc., Greater Iowa Credit Union, and Springleaf Mortgage Services. Each of these entities declined to defend Debtor's objections to their proofs of claim.

2

purchase of the Bunker Property and rental property, but it is still unclear how the funds were used or where the money went.

Stephanie and Debtor had a pending settlement in a class action lawsuit against Medtronic that became part of the loan discussions with the Bank. Debtor has a heart condition, and he used a defibrillator created by Medtronic. Debtor had to replace his defibrillator equipment at least twice because of recalls. The Note documents specifically mention the pending settlement as the Bank's rationale for a repayment extension. At a minimum, the Bank at least partially considered the representations made about the pending settlement when it extended credit.

Debtor testified that he did not speak to the Bank representatives about the settlement or his condition. However, Stephanie represented to the Bank that she anticipated a significant monetary settlement resulting from the suit. Her representations, and actions related to them, led to serious consequences for her.

## I.  Stephanie's Fraud Related to this Bankruptcy

On November 17, 2014, Stephanie was sentenced in the United States District Court for the Northern District of Iowa for bank fraud and unlawful manufacture and possession of United States government insignia. According to the District Court records, Stephanie forged a letter from a sitting state judge in Minnesota.[2] The letter stated that Stephanie and Debtor were going to receive a

---

[2] The Judge whose signature is on the letter was sitting in Minnesota, but was not

structured settlement from Medtronic for $2,200,000. She showed this letter to the Bank in an attempt to prove that a settlement was pending and as a form of collateral for the Notes. Debtor did eventually receive a settlement from Medtronic, but the amount was minimal—less than $1,000. This settlement was finalized sometime in 2010.

The federal charges against Stephanie and the sentence she received specifically referred to the Notes that are in dispute here. Debtor and Debtor's parents were included on the victims list in the criminal matter. They state that they are victims because Stephanie forged Debtor's signature and the Note that Debtor's parents signed was altered. No additional evidence was offered about their status as victims.

Debtor testified that he thought the rental property had been financed through a personal loan from Stephanie's co-worker. He also testified that he had understood that the second property—Bunker Property—had been financed through the Greater Iowa Credit Union. He testified that he was unaware that Stephanie used either property as collateral for the Notes. He further stated that he was only made aware that these properties were collateral for a loan with the Bank when the Sheriff served him foreclosure papers.

---

sitting in the county where the letter supposedly originated.

Shortly after Debtor received the foreclosure papers, Debtor claims he confronted Stephanie about the finances. He claims she told him about her fraudulent activities. She became unstable, and Debtor helped her move into a mental institution for a short period of time.

Debtor testified that while Stephanie was in the institution, he discovered the fraudulent documents she created and other information related to the fraud. Debtor claimed that he was a victim of burglary, and the documents relating to the alleged forgeries were stolen. It is unclear who perpetrated this burglary. Nonetheless, Debtor testified he provided all documents and information he still had after the burglary to the FBI when requested.

## II. The First Note

The First Note bears the signature of Debtor, Stephanie, and both of Debtor's parents. Debtor unequivocally testified that he did not sign the First Note. Debtor's father testified and admitted he and his wife signed the First Note. His father testified they signed the note at their home. Debtor's father also testified that when he and his wife signed the First Note, the amount on the note was $40,000. The amount listed on the Bank's copy of the First Note is $162,600.52.

The date on the First Note is March 9, 2009. Debtor testified it could not have been signed on March 9, 2009 because he was at work that day. Debtor's father testified he was not in Hubbard, Iowa at the time.

The Bank's **former** President, Roger L. Severson testified that he was the Bank representative that worked on the Notes. He stated that it was his practice to prepare the loan documents in anticipation of parties coming in to sign the loans. He stated that he prepared the First Note on March 9, but it was signed on a later date.

The Bank entered the First Note into their system on March 12, 2009. The Bank's practice was to enter the loan into its system only after obtaining signatures from all parties involved.

Mr. Severson's notarization is present on the mortgage documents related to the First Note. Mr. Severson testified that it was not his practice to notarize documents unless the person purporting to sign the document was present. Mr. Severson specifically recalls having all four individuals in his office to sign the loan papers. He specifically recalls this in part because he had a small office and fitting four people into it was somewhat of a challenge, particularly because he only had three chairs available.

In addition, two other **former** Bank employees, Ms. Roseann Swenson and Ms. Joy Wykle, testified at the hearing. Ms. Swenson, who served as a teller and bookkeeper at the time, stated that she remembered an occasion when Debtor, Stephanie, Debtor's father, and a fourth person (she presumed was Debtor's mother) in Mr. Severson's office. She explained that after Mr. Severson completed

the loan documents, he normally put them in a bin for processing. She testified that she was curious about the family's activities, so she peeked at the loan documents after Mr. Severson put them in the bin. She saw the completed loan document, including all four signatures at the bottom of the document. She was unable to recall what day this incident occurred.

    Ms. Wykle, who worked in the insurance department, also stated that she recalled Debtor, Stephanie, and Debtor's parents coming into the bank. She was unsure why they were there, but believed that they were there to sign loan documents. Like Ms. Swenson, Ms. Wykle was unable to recall the specific date that this occurred. She did note that it was not an every-day event to have four people come in together to sign documents.

    The Bank also presented the testimony of Mr. Dale Torpey, the Vice President of DW Heineking, Inc., the Bank's holding company. Mr. Torpey testified that he seriously doubted Stephanie had the ability to alter the First Note from $40,000 to over $160,000 without having access to the Bank's loan processing software. Stephanie did not have access to this software. While there was testimony that Stephanie's daughter did work at the bank on and off, there was no evidence or even indication that she had access to this software—let alone assisted her mother in her fraudulent scheme.

7

The Court concludes that the First Note was signed by all parties at some point between March 9, 2009 and March 12, 2009. In particular, the Court finds the testimony of the disinterested witnesses to be extremely credible. None of the three Bank employees currently work for the Bank. They have no ascertainable reason to fabricate a story about all four people coming into the bank together to sign loan documents. There was no evidence of another loan where all four parties may have been involved. Thus, the most credible and believable evidence is that these four individuals must have come into the bank to sign at least one of the disputed Notes. The Court also finds that the Debtor did not present sufficient evidence to show Stephanie altered the loan amount on the First Note. Therefore, the Court finds that the First Note, as presented in the Bank's Proof of Claim #8, is a binding obligation of the Debtor.

### III.  The Second Note

The Second Note is for $235,925.80. Like the First Note, it is a consolidation of previous loans. It is secured by a mortgage on real estate that Stephanie and Debtor jointly own. The Second Note bears the signatures of Debtor and Stephanie. Debtor testified that he did not sign this Note or know anything about this Note.

Mr. Severson testified that he did not specifically recall meeting with Debtor and Stephanie on this particular loan. However, like the First Note, Mr. Severson

notarized the mortgage related to the Second Note. Mr. Severson specifically stated that it was not his practice to notarize documents when he did not personally observe the document being signed.

The Court finds that Debtor signed the Second Note. The evidence relating to the First Note affects this finding in a significant way. That evidence undermined Debtor's credibility about what he did and did not sign. The Court thus overrules Debtor's objection to Proof of Claim #8.

## ANALYSIS

The bankruptcy court is obligated to weigh the credibility of witnesses and evidence and make fact findings. Judge Kilburg aptly explained this Court's duty in performing these obligations:

> In weighing the credibility of a witness, the Court must examine the evidence presented and evaluate the testimony of the witness including variations in demeanor as well as changes in the tone of voice. *Anderson v. City of Bessemer,* 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). The Court can assess credibility based upon the content of the testimony as well as the Court's own experience with the way people act. *In re Carrigan,* 109 B.R. 167, 170 (Bankr.W.D.N.C.1989). Where two permissible views of the evidence exist, it is the responsibility of the Court to weigh the evidence presented including the credibility of the witnesses and make a choice between them. *In re Waugh,* 95 F.3d 706, 712 (8th Cir.1996); *In re Dullea Land Co.,* 269 B.R. 33, 36 (8th Cir. BAP 2001) (discussing bankruptcy court's evaluation of evidence and credibility of witnesses).

Maynard Savs. Bank v. Banke III (In re Banke III), 275 B.R. 317, 328 (Bankr. N.D. Iowa 2002).

9

When a creditor files a proof of claim that satisfies the requirements of the Bankruptcy Rules, it is presumed valid unless an objection is filed. McDaniel v. Riverside Cnty. Dep't of Child Support Servs. (In re McDaniel), 364 B.R. 531, 533 (B.A.P. 8th Cir. 2001); Fed. R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."). Any objection that is filed must be supported by substantial evidence to "deprive the proof of claim of presumptive validity." Id. (quoting Brown v. IRS (In re Brown), 82 F.3d 801, 805 (8th Cir. 1996)).

Thus, the objecting party has the burden to prove that the proof of claim is not valid. Id.; see also In re Halsey, No. BK09-42011, 2014 WL 7139784, at *3 (Bankr. D. Neb. Dec. 15, 2014). Once that burden is met, the claimant is given the opportunity to validate the claim. See Fed. Deposit Ins. Corp. v. Union Entities (In re Be-Mac Transp. Co., Inc.), 83 F. 3d 1020, 1025 & n.3 (8th Cir. 1996).

Debtor objected to the Bank's proof of claim on the grounds that the debts were fraudulent and therefore should not be included in the claims paid in his bankruptcy. Debtor had the opportunity to prove the Bank's claim was not valid. He attempted to do so by raising serious concerns about the claim's validity. However, the Bank submitted stronger and more persuasive evidence supporting the validity of its claim.

The Bank presented very credible witnesses and sufficient documentary evidence to rebut Debtor's objection. The Court thus concludes that Debtor's objection to the Bank's proof of claim is overruled. The Bank is thus entitled to have its claims included in the distribution, if any, from Debtor's bankruptcy estate.[3]

## CONCLUSION

The Court overrules Debtor's objection to the Bank's Proof of Claim #8.

**WHEREFORE**, Proof of Claim #8 will be included in determining distribution from this Debtor's bankruptcy estate.

Dated and Entered:
April 1, 2015

_____
**THAD J. COLLINS**
**CHIEF BANKRUPTCY JUDGE**

---

[3] Both the Bank and Debtor presented handwriting experts that examined Debtor's signatures on each Note. However, because the Court determined that the Bank's witnesses were credible, there is no need to address the experts' findings.